IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| KATHY M. GEORGE, on behalf of the ESTATE OF TROY BRADSHAW,<br><br>Plaintiff,<br><br>v.<br><br>BEAVER COUNTY, by and through the Beaver County Board of Commissioners; CAMERON M. NOEL, RANDALL ROSE, and DOES 1-10, inclusive,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br><br>Case No. 2:16-CV-1076 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on Defendant Randie Rose's Motion for Summary Judgment.  For the reasons discussed below, the Court will grant the Motion.

## I.  BACKGROUND

This case arises out of the death of Troy D. Bradshaw ("Mr. Bradshaw") at the Beaver County Correctional Facility ("BCCF" or "Jail") on June 15, 2014.  Mr. Bradshaw was arrested on the night of June 13, 2014.[1]  He was brought to the Beaver Valley Hospital to be medically cleared before being booked into the Jail.[2]  While at the hospital, he asked an officer to kill him on two separate occasions.[3]

After being medically cleared, he was transported to the BCCF.  Once at the Jail, an Initial Arrestee Assessment was completed as part of the pre-booking process.  Mr. Bradshaw

---

[1] Docket No. 116-2.

[2] Docket No. 122-11, at 8–9.

[3] *Id.* at 23.

indicated that he had thought about suicide in the past, was not thinking about it currently but was "questionable," had a brother who committed or attempted suicide, and was intoxicated with either drugs or alcohol.[4]  Mr. Bradshaw also stated that he would kill himself if he was put in a cell.[5]  When he was placed in the cell, Mr. Bradshaw was agitated and engaged in self-harming behavior.[6]

Mr. Bradshaw was placed on suicide watch.[7]  Once on suicide watch, Mr. Bradshaw should have remained as such until cleared by medical personnel at the jail.  It was the responsibility of the shift supervisor to communicate with the medical staff before a detainee was removed from suicide watch.[8]  It does not appear that medical personnel were informed that Mr. Bradshaw was suicidal.[9]  It was also the responsibility of the shift supervisor to inform the floor officers of an inmate that posed a potential suicide risk.[10]

Mr. Bradshaw was placed in a special "dry" cell ("Cell 2") and was monitored by an officer all night.[11]  However, Mr. Bradshaw was not placed in a safety smock or given a suicide blanket.[12]  Additionally, no suicide watch log was created.[13]  The shift-change report prepared by

---

[4] Docket No. 122-11, at 2.

[5] Docket No. 116-3, at 1.

[6] Docket No. 122-2, at 35.

[7] *Id.* at 60.

[8] *Id.* at 23–24.

[9] Docket No. 122-14, at 16.

[10] Docket No. 122-3, at 8; Docket No. 122-15, at 8.

[11] Docket No. 122-2, at 15.

[12] *Id.*

[13] *Id.*

on the morning of June 14, 2014, noted that Mr. Bradshaw was suicidal and in Cell 2.[14] Corporal Kinross, the officer who prepared the report, testified that she would have also passed this information on verbally to the oncoming corporal, Defendant Rose, but neither had a direct recollection of this happening.[15]

On June 14, 2014, Mr. Bradshaw was transferred out of Cell 2 and into Cell 3, which, like Cell 2, is in the booking area of the Jail.[16]  However, unlike Cell 2, Cell 3 had a toilet, sink, and a bed.  By the time of the transfer, Mr. Bradshaw was being respectful and was no longer violent.[17]  The officer who initiated the transfer was unaware that Mr. Bradshaw was suicidal.[18] Such a transfer required approval from a corporal or higher.[19]  Defendant Rose, as the corporal on duty at that time, approved Mr. Bradshaw's transfer from Cell 2 to Cell 3.[20]

The transfer to Cell 3 allowed Mr. Bradshaw the opportunity to use the bathroom and move to a cleaner cell.[21]  The transfer kept Mr. Bradshaw in the booking area where he could continue to be watched.[22]  The transfer could also allow a non-suicidal inmate the opportunity to obtain bedding.[23]  It is unclear who provided Mr. Bradshaw bedding or when that occurred. There is testimony that the normal course would be to provide bedding to a prisoner at the same

---

[14] Docket No. 122-7, at 49.

[15] Docket No. 122-2, at 18; Docket No. 122-10, at 58.

[16] Docket No. 122-10, at 2.

[17] Docket No. 122-3, at 7.

[18] *Id.* at 4.

[19] Docket No. 122-2, at 41; Docket No. 122-5, at 76.

[20] Docket No. 122-3, at 7.

[21] *Id.*

[22] *Id.* at 7, 24, 25.

[23] Docket No. 122-2, at 43.

time they were transferred from Cell 2 to Cell 3,[24] but there were times when it would be provided later.[25]  There is no evidence that Defendant Rose provided Mr. Bradshaw bedding or directed anyone else to do so.

The move to Cell 3 suggested to some officers that Mr. Bradshaw was no longer on suicide watch since an individual on suicide watch would generally be in Cell 2 and would not have bedding and similar items.[26]  In contrast, there is evidence that all cells in the booking area could be used to house a suicidal inmate,[27] and a transfer out of Cell 2 could occur if the inmate needed to use the bathroom.[28]  Both cells were in a high profile area of the jail where officers and staff were regularly coming and going.[29]

A second assessment was completed in the afternoon of June 14, 2014, when Mr. Bradshaw was officially booked into the jail.[30]  This assessment occurred after Mr. Bradshaw had already moved to Cell 3.  Defendant Rose was present during the assessment.[31]  When asked if he was thinking about committing suicide at that time, Mr. Bradshaw responded "Yes."[32]  This

---

[24] *Id.*

[25] Docket No. 122-8, at 50.

[26] Docket No. 122-2, at 43; Docket No. 122-6, at 19, 23; Docket No. 122-15, at 3–5.

[27] Docket No. 117 ¶ 14; Docket No. 122-2, at 27; Docket No. 122-6, at 20.

[28] Docket No. 122-5, at 19.

[29] Docket No. 117 ¶ 14.

[30] Docket No. 122-11, at 3–6.

[31] Docket No. 122-8, at 6–8.

[32] *Id.* at 16.

statement was communicated to Defendant Rose.[33]  The booking officer testified that she turned to Corporal Rose and asked, "Did you get that?" and Defendant Rose said "Yes."[34]

The assessment indicated that Mr. Bradshaw was suicidal, should be placed on watch, and referred to the medical staff.[35]  Typically, and in accordance with BCCF policy, a suicidal inmate is strip searched, placed in a suicide smock, placed in Cell 2, put on a 15-minute watch, and referred to medical personnel.[36]  Additionally, all potential implements of suicide, including bedding and clothing, are removed from the cell.[37]  The corporal or lieutenant on duty would be alerted and was responsible for taking these measures.[38]  It is not clear why, but it does not appear that any of this occurred.  Instead, Mr. Bradshaw was returned to Cell 3.

After Defendant Rose's shift ended on June 14, Mr. Bradshaw was seen by a nurse in the booking area.  Mr. Bradshaw was still in his street clothes,[39] meaning he had yet to be given jail clothes.  The nurse directed officers to provide Mr. Bradshaw a blanket because she was concerned he might go into shock.[40]  Defendant suggests that it was at this point that Mr. Bradshaw was provided his bedroll, which would have contained a sheet, pillowcase, and pillow

---

[33] *Id.* at 27.

[34] *Id.*

[35] Docket No. 122-11, at 3.

[36] Docket No. 122-6, at 45–50.

[37] *Id.*

[38] Docket No. 122-8, at 37–38.

[39] Docket No. 116-6, at 3.

[40] *Id.*

in addition to a blanket.  However, there is no evidence how officers responded to the nurse's direction and, specifically whether Mr. Bradshaw was provided a complete bedroll.[41]

Mr. Bradshaw was taken to the hospital late that evening to have his leg examined.[42] When he returned, he was again placed in Cell 3.

The shift-change reports prepared on the night of June 14, 2014, and morning of June 15, 2014, do not state that Mr. Bradshaw was suicidal.[43]  The corporal on shift is responsible for preparing the shift reports.[44]  Defendant Rose did not prepare a shift change report for the south side of the jail, where Mr. Bradshaw was housed, on June 14, 2014.  Instead, it appears that Lieutenant Tyler Fails—then a corporal overseeing the north side of the jail—completed one for both sides of the jail.  Lieutenant Fails could not remember whether Defendant Rose informed him that Mr. Bradshaw was on suicide watch.[45]  If Lieutenant Fails had known that Mr. Bradshaw was on suicide watch he would have included that information in his shift change report.[46]  The shift change reports and word-of-mouth were the ways in which officers would learn of a suicidal inmate.[47]  A number of officers testified that they were unaware Mr. Bradshaw was on suicide watch.[48]

---

[41] Docket No. 122-14, at 21.

[42] Docket No. 116-5, at 1.

[43] Docket No. 122-7, at 50–56.

[44] Docket No. 122-8, at 12; Docket No. 112-15, at 44.

[45] Docket No. 122-9, at 45.

[46] *Id.* at 50.

[47] Docket No. 122-6, at 10–11; Docket No. 122-8, at 13.

[48] Docket No. 122-3, at 29; Docket No. 122-5, at 45–46; Docket No. 122-10, at 18–19.

There is little information about Mr. Bradshaw on June 15, 2014.  By the time Rose arrived for his shift that morning, Mr. Bradshaw has received bedding and clothing.  Mr. Bradshaw was fed breakfast and lunch.  He ate some of his lunch and placed the rest on the shelf at the head of his bed.  Defendant Rose reported that Mr. Bradshaw appeared to be in good spirits that day and slept a lot.  Mr. Bradshaw was last seen alive around 11:45 a.m.  Just after noon on that day, Mr. Bradshaw was found dead in his cell, having hanged himself with a pillowcase.

Plaintiff brought this suit against Randie Rose, Beaver County, and the Beaver County Sheriff.  The Court previously granted summary judgment to Beaver County and the Beaver County Sheriff.[49]  Defendant Rose now moves for summary judgment on Plaintiff's remaining claim under the Fourteenth Amendment.[50]

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[51]  In considering whether a genuine dispute of material fact exists, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence

---

[49] Docket No. 94.

[50] Plaintiff has dismissed her claims under Utah law.

[51] Fed. R. Civ. P. 56(a).

presented.[52]  The Court is required to construe all facts and reasonable inferences in the light

most favorable to the nonmoving party.[53]

### III.  DISCUSSION

Defendant seeks judgment on a number of grounds, arguing that Plaintiff has failed to

state a claim, that the claim is barred by the statute of limitations, and that he is entitled to

qualified immunity.  The Court agrees that Defendant is entitled to qualified immunity and will

limit its discussion to that issue.

"Qualified immunity exists to protect government officials 'from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.'"[54]  Once a defendant invokes qualified

immunity, the plaintiff bears the burden of demonstrating: "(1) the defendant violated a

constitutional right and (2) the constitutional right was clearly established."[55]  "This is a heavy

burden.  If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified

immunity."[56]

---

[52] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[53] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

[54] *Estate of Reat v. Rodriguez*, 824 F.3d 960, 964 (10th Cir. 2016) (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1191 (10th Cir. 2010)).

[55] *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).

[56] *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017).

"[C]laims based on a jail suicide are considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody."[57]  Thus, such claims "must be judged against the 'deliberate indifference to serious medical needs' test of *Estelle v. Gamble*."[58]

"Deliberate indifference involves both an objective and a subjective component."[59]  The objective component is met if the deprivation is "sufficiently serious."[60]  A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."[61]  "[S]uicide satisfies this requirement."[62]

The subjective component is met only if a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[63]  Thus, "a plaintiff must establish that defendant(s) knew he faced a substantial risk of harm and disregarded that risk, 'by failing to take reasonable measures to abate it.'"[64]  In this case, Plaintiff must show that Defendant knew of the specific risk that Mr. Bradshaw would

---

[57] *Barrie v. Grand Cty.*, 119 F.3d 862, 866 (10th Cir. 1997).

[58] *Estate of Hocker ex rel. Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir. 1994).

[59] *Sealock v. Colo.*, 218 F.3d 1205, 1209 (10th Cir. 2000) (internal quotation marks omitted).

[60] *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal citation and quotations omitted).

[61] *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)).

[62] *Gaston v. Ploeger*, 229 F. App'x 702, 710 (10th Cir. 2007).

[63] *Farmer*, 511 U.S. at 837.

[64] *Hunt*, 199 F.3d at 1224 (quoting *Farmer*, 511 U.S. at 847).

commit suicide.[65]  "Custodians have been found to 'know' of a particular vulnerability to suicide when they have had actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities."[66]  "Whether the prison official had the requisite knowledge of a substantial risk to an inmate's health or safety 'is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . .'"[67]

Defendant denies knowing that Mr. Bradshaw was a suicide risk.  The shift report created after Mr. Bradshaw was booked into custody indicated that he was suicidal.  The testimony reflects that after Mr. Bradshaw was identified as a suicide risk, everyone that worked at the jail thereafter should have been aware of this.[68]  Rose himself testified that everyone working at the Jail should have been aware that Mr. Bradshaw was suicidal.[69]  However, the notion that Defendant should have known this is not sufficient to demonstrate deliberate indifference.[70] Moreover, the mere fact that Mr. Bradshaw had been placed on suicide watch when he first entered the jail is insufficient.  "Placing a pretrial detainee on some level of suicide watch, even

---

[65] *Estate of Hocker*, 22 F.3d at 1000.

[66] *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1025 n.1 (3d Cir. 1991).

[67] *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001) (quoting *Farmer*, 511 U.S. at 842).

[68] Docket No. 122-6, at 16; Docket No. 122-15, at 10.

[69] Docket No. 122-5, at 17.

[70] *Farmer*, 511 U.S. at 837; *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998) ("It is not enough to establish that the official should have known of the risk of harm.").

the highest level, does not demonstrate a subjective awareness of a substantial risk of imminent suicide."[71]

While these things are insufficient to demonstrate knowledge, there is evidence that Defendant knew that Mr. Bradshaw posed a risk of suicide, at least on the afternoon of June 14. Specifically, there is testimony that Rose was present when the second assessment was conducted when Mr. Bradshaw again stated that he was thinking of committing suicide. The booking officer testified that she confirmed with Defendant Rose that he heard Mr. Bradshaw state that he was suicidal. From this, a reasonable jury could conclude that Defendant Rose knew that Mr. Bradshaw faced a substantial risk of serious harm on June 14.

The more difficult question is Defendant's knowledge on the day of Mr. Bradshaw's death. Rose left the jail on June 14 after his shift ended at 6:00 p.m. and returned the next day at 6:00 a.m. By the time Defendant returned, Mr. Bradshaw had been provided jail clothing and bedding. As stated, it is unclear who provided these materials or when. However, since Mr. Bradshaw was still in his street clothes when he saw the nurse at around 6:30 p.m. on June 14— after Rose's shift had ended—we know that he was not provided clothes until after Rose left for the day. There is testimony that clothing and bedding would generally be provided at the same time.[72] As set forth above, the fact that Mr. Bradshaw was in jail clothes and had obtained bedding was an indication to many officers that he was no longer on suicide watch.

---

[71] *Simmons v. Navajo Cty.*, 609 F.3d 1011, 1018 (9th Cir. 2010) (quoting *Collignon v. Milwaukee Cty.*, 163 F.3d 982, 990 (7th Cir. 1998)).

[72] Docket No. 125-9, at 23–24.

In his Second Declaration, Defendant Rose states that Mr. Bradshaw was in good spirits on June 15 and he does "not recall that he was suicidal at all."[73]  As discussed, Mr. Bradshaw was transferred to Cell 3 on the afternoon of June 14 when he was being respectful and was no longer violent.  While he endorsed suicidal ideation later during the booking process, there is no further evidence that Mr. Bradshaw continued expressing suicidal thoughts after the second assessment.  In fact, there is hardly any evidence about Mr. Bradshaw's behavior on June 15.  He was fed breakfast and lunch and was later seen resting in his cell.  Thus, while there is evidence that Mr. Bradshaw presented a risk of suicide on June 14, there is no evidence that he remained at an "acute risk" thereafter.[74]  More specifically, there is no evidence that Defendant Rose "knew of a specific and excessive risk of harm to [Mr. Bradshaw] on the [day] of his suicide."[75]  Indeed, it would have been reasonable for him to assume that Mr. Bradshaw had been removed from suicide watch sometime between when his shift ended on June 14 and when he returned to the Jail on the morning of June 15, given the circumstances.

Further, Rose has stated that he was unaware of any suicides in the jail prior to Mr. Bradshaw's death.[76]  The fact that no inmate had previously died by suicide at the jail cuts against a finding that Defendant knew Mr. Bradshaw presented a substantial risk of harm to himself.[77]

---

[73] Docket No. 117 ¶ 22.

[74] *Conn v. City of Reno*, 591 F.3d 1081, 1097 (9th Cir. 2010), *vacated on other grounds by* 563 U.S. 915.

[75] *Bame v. Iron Cty.*, 566 F. App'x 731, 741 (10th Cir. 2014)

[76] Docket No. 117 ¶ 15.

[77] *Bame*, 566 F. App'x at 739 n.14.

Assuming that Defendant was aware that Mr. Bradshaw presented a substantial risk of suicide, the question becomes whether he failed to take reasonable measures to abate it. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."[78]  "[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause."[79]

Plaintiff points to a number of failures to follow the Jail's suicide prevention policies to support her claim.  Specifically, after the second assessment, Mr. Bradshaw was not strip searched, given a suicide smock, referred to medical, or checked in 15-minute increments.  In addition, Plaintiff complains about the transfer to Cell 3, the fact that Mr. Bradshaw was permitted to have bedding and other items, and that Rose failed to complete a shift report on the evening of June 14.

Plaintiff correctly points out that a number of these actions violated Jail policy. However, these violations alone do not necessarily constitute acts of deliberate indifference.[80] Moreover, there is little evidence attributing much of this conduct to Defendant Rose.  Defendant did approve of Mr. Bradshaw's transfer from Cell 2 to Cell 3.  Plaintiff argues that, by allowing Mr. Bradshaw to be transferred, Rose permitted him to have bedding and clothing.  However,

---

[78] *Farmer*, 511 U.S. at 844.

[79] *Id.* at 845.

[80] *See Davis v. Scherer*, 468 U.S. 183, 194 (1984); *see also Gaines v. Stenseng*, 292 F.3d 1222, 1225 (10th Cir. 2002) ("To the extent Gaines seeks relief for alleged violations of state statutes and prison regulations, however, he has stated no cognizable claim under § 1983."); *Hovater v. Robinson,* 1 F.3d 1063, 1068 n. 4 (10th Cir. 1993) ("[A] failure to adhere to administrative regulations does not equate to a constitutional violation."); *see also Hostetler v. Green,* 323 F. App'x 653, 657–58 (10th Cir. 2009).

there is no evidence as to who provided Mr. Bradshaw these materials or when. More specifically, the transfer occurred before Rose knew that Mr. Bradshaw was suicidal and there is no evidence that Defendant Rose provided Mr. Bradshaw bedding or directed anyone else to do so. Indeed, it appears that Mr. Bradshaw was provided these materials sometime after Rose's shift ended on June 14. Without more, this conduct cannot be attributed to Defendant Rose.

In addition, though Defendant Rose approved Mr. Bradshaw's transfer to Cell 3, he left Mr. Bradshaw in the booking area of the jail. The booking area is a high traffic area where no prior inmates had died by suicide. Defendant Rose believed that Mr. Bradshaw was being frequently observed in the booking area.[81] He believed that this supervision would prevent a suicide attempt.[82] While Rose was ultimately incorrect in his belief, this "error amounts to negligence at the most. That is insufficient to establish deliberate indifference."[83]

Plaintiff is correct that Rose failed to complete a shift change report at the end of his shift on June 14. However, the failure to complete a shift change report is not itself a constitutional violation. Even if the shift change report on June 14 should have included reference to Mr. Bradshaw's suicidality, the factfinder would have to assume that such information would have carried over to the shift change report prepared on the morning of June 15. Given Mr. Bradshaw's behavior, there is little to support such an assumption. In addition, Plaintiff has failed to show that the failure to include this information in the shift change report on the

---

[81] Docket No. 117 ¶¶ 14, 16, 29.

[82] *Id.* ¶ 16.

[83] *Bame*, 566 F. App'x at 739.

evening of June 14 caused Mr. Bradshaw's suicide.[84]  At best, it would have resulted in more frequent monitoring, but a "failure of frequent monitoring . . . [does] not amount to deliberate indifference."[85]

While Plaintiff points to a number of failures at the Jail, these failures are not enough to satisfy the deliberate indifference standard.  At bottom, Plaintiff argues that the Jail should have done more to prevent Mr. Bradshaw's suicide, but this is not sufficient to demonstrate deliberate indifference.[86]  Because Plaintiff has failed to show that Defendant violated a constitutional right, the Court need not decide whether that right was clearly established.

## IV.  CONCLUSION

It is therefore

ORDERED that Defendant's Motion for Summary Judgment (Docket No. 116) is GRANTED.

---

[84] S*ee Daniels v. Glase*, No. 97–7115, 1999 WL 1020522, at *5 (10th Cir. Nov. 3, 1999) (unpublished) (concluding that no constitutional violation was shown where plaintiff failed to demonstrate the failure to fill out a medical evaluation form or the jail's staffing level caused the inmate's suicide).

[85] *Bame*, 566 F. App'x at 741.

[86] *See City of Canton v. Harris*, 489 U.S. 378, 391 (1989); *see also Gaston*, 297 F. App'x at 746 (stating that a claim that an officer "should have done more is insufficient, because the constitutional claims require a showing much higher than what is required for mere negligence"); *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989) (stating that "it is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did").

DATED this 18th day of December, 2020.

BY THE COURT:

_____

Ted Stewart
United States District Judge